Theresa McGarrity, Admx., *vs.* N. Y., N. H. & H. R. R. Company.

PROVIDENCE—JUNE 19, 1903.

PRESENT: Stiness, C. J., Tillinghast and Douglas, JJ.

(1) *Master and Servant.   Negligence.   Evidence.*

A plaintiff may properly show the condition of the machine or appliance by which the injury was caused, before the time of the accident, for the purpose of proving that the defendant knew or ought to have known of the danger connected therewith and was negligent in not remedying the defect.

(2) *Master and Servant.   Evidence.   Pleading.*

It is competent for a plaintiff to show the particular condition of the instrumentality by which the injury was caused, and how the same contributed to the accident, although no particular stress was laid in the declaration upon such facts.

(3) *Practice.   Objection to Testimony.*

Objection to testimony should be made when it is offered. It is too late thereafter to move to strike such evidence from the record.

(4) *Expert Witnesses.   Evidence.*

A witness who has duly qualified as an expert regarding the construction and inspection of the appliance causing the injury may properly be asked, in cross-examination by the plaintiff, whether upon the state of facts that were proved to exist the appliance was in proper condition

(5) *Requests to Charge.   New Trial.*

It is no error to refuse a request to charge, substantially correct though it may be as a proposition of law, where the same principle of law is contained in another request which is granted.

(6) *New Trial.   Master and Servant.   Assumed Risk.*

A request to charge that if plaintiff knew, or in the exercise of reasonable care might have known, that the appliance was apt to become in the condition in which it was when the injury occurred, he assumed the risk, was properly refused, as it omits a vital element of assumed risk—knowl-

edge of the danger reasonably to be anticipated from a known defect; and, further, because from the facts of the case it was competent for the jury to find that plaintiff's duties were so engrossing at the time as to divert his attention from the danger.

(7)   *Master and Servant.   Duty to Servant.   Custom.*

As a master cannot avoid liability for the neglect of his servant who is expressly delegated by him to perform a duty, especially he cannot escape such liability for the failure of his servants to observe a mere custom of themselves performing his duty for him, where he has chosen to rely upon such custom.

(8)   *Master and Servant.   Notice to Master.   Question of Fact.*

Where plaintiff's intestate lost his life by being caught by the neck in a "tell-tale" on defendant's railroad, while in defendant's employ as a brakeman, and it appeared in evidence that the looping of the ropes of the tell-tale caused by the exhaust of the engine was a well-known fact, and that the particular loop by which intestate was caught had existed for several days prior to the accident, and that defendant had adopted a system of inspection of these tell-tales in order to prevent such danger, it is apparent that defendant had knowledge of the general condition of the tell-tales before the accident and recognized its duty in protecting its employees from danger therefrom, and whether it failed in this regard is a question for the jury.

TRESPASS ON THE CASE for negligence.   Heard on petition of defendant for new trial, and petition denied.

TILLINGHAST, J.   The plaintiff's intestate, Hugh McGarrity, lost his life by being caught by the neck in a tell-tale on the defendant's railroad near the Conant street bridge in the city of Pawtucket.   He had been in the defendant's employ at its freight house in Pawtucket, trucking freight for several years, and until a day or two before the happening of the accident in question.

The facts connected with the happening of the fatal accident are substantially as follows:

On the 30th day of August, 1900, said Hugh McGarrity was in the defendant's employ in the capacity of head brakeman, and was at work on freight cars in the freight yard of the railroad at Pawtucket, his duty being to aid in switching cars back and forth on the various tracks of the yard.   In doing this the cars were hauled forward from the various sidings in the yard onto the main track, which was connected

with all the sidings.  This track ran under the Conant street bridge.  When the cars were far enough over the switch to clear it, it would be turned and the cars would be pushed back wherever they were going for the time being.  Said bridge had a tell-tale north of it, to warn the brakemen when they were approaching the bridge from that direction that they must stoop.  On the day of the accident McGarrity was standing on top of a furniture car that was being hauled forward from one of the sidings.  Three of the ropes of the tell-tale near the bridge had become looped in some way in a sort of half-hitch; that is, one rope was thrown about two of the others and looped over.  In some way McGarrity's neck was caught in this half-hitch, and the ropes held together in such a manner that he was dragged off of his feet and thrown from the car, receiving injuries from which he shortly afterwards died.  The plaintiff was afterwards appointed administratrix of his estate, and she brings this action for the benefit of herself, as widow, and the children of the deceased, alleging in her declaration that the defendant "unlawfully, negligently and carelessly suffered and permitted its certain appliance, to wit, a railroad tell-tale then and there owned, provided and maintained in its freight yard adjacent to said railroad bridge, to become and be in a dangerous, improper and unsafe condition, and perilous to the safety and health of the plaintiff's intestate, Hugh McGarrity, in that the hanging cords or ropes which then and there hung from the cross-bars of said telltale, and which were a part and parcel thereof, became and were caught, tangled and twisted together so that the same were liable to catch the plaintiff's intestate . . . of which dangerous condition of said tell-tale the plaintiff's intestate was unaware."

At the time of the accident, McGarrity was standing about in the centre of the roof of the furniture car, which is one of the highest types of a freight box car, being from eighteen inches to two feet higher than the ordinary box car.  He was the head brakeman, and it was his duty to be upon the first or head car on the train and to take signals from the switchman in the yard and transmit them to the engineer, the proper dis-

charge of which duties necessitated that he should have his back to the engine, the way the train was going, in order to see the switchman and take the signals. He was standing in this way at the time of the accident. The tell-tales consist of a bar of wood or iron extending over the track and supported by posts upon either side, from which short ropes are suspended at such a height as to strike brakemen about the head and shoulders when riding on box cars and approaching the bridge. These ropes are sometimes called lashes, and are hung about six or eight inches apart. The tell-tales in question consisted of ropes about half an inch in diameter and about two feet long, wound about at the bottom end with fine wire or string to prevent the ropes from unraveling and fraying at the ends. Said half-hitches or loops in the tell-tales were formed by the exhaust of the engine when passing under them. There is evidence to the effect that the ends of the ropes in question had become frayed by reason of the unraveling of the wire or string which bound the ends, and that the ends afterwards became enlarged and sometimes were knotted, forming a bunch at the end; and also that, whenever ropes which were thus knotted were thrown together in a half-hitch or loop, the loop tended to tighten and bind, upon pressure, by reason of the enlarged condition of the ends of the ropes.

At the trial of the case to the jury, a verdict was rendered for the plaintiff, and the case is now before us upon the defendant's petition for a new trial on the grounds of certain alleged erroneous rulings of the trial court in the admission and rejection of testimony, and also in his charge to the jury; that the verdict is against the evidence, and that the damages awarded are excessive.

(1)    The first class of exceptions relied on by the defendant are those which were taken to the admission of testimony as to the condition of the tell-tales in said freight yard at various times shortly before the happening of the accident; it being contended in support of these exceptions that whether this tell-tale and others in the immediate vicinity had been looped up at some previous time, unless the particular looping which caused the injury had continued down to the time of the acci-

dent, or whether other tell-tales had become looped up in a similar manner, was immaterial; that to allow this to be shown was to permit the plaintiff to prove other acts of negligence and thereby prejudice the defendant's case.

This position is untenable.  For while it is true, as held by this court in Agulino v. N. Y., N. H. & H. R. R. Co., 21 R. I. 263, that in an action of negligence the plaintiff cannot be permitted to show facts and circumstances connected with other accidents or other occasions which would tend to raise collateral issues, yet it is not the law that only the particular facts and circumstances immediately connected with the happening of an accident can be shown in evidence.  On the contrary, the plaintiff may properly show the condition of the machine or appliance by which the injury was caused before the time of the accident, for the purpose of proving that the defendant knew or ought to have known of the danger connected therewith, and was negligent in not remedying the defect.

(2)   After the plaintiff had rested her case, defendant's counsel moved the court to strike out all the testimony which had been introduced showing that the ropes of the tell-tale forming the loop by which the deceased was caught were knotted at the ends.  This motion was refused, and the defendant excepted.  The ruling was correct.  It was clearly competent for the plaintiff to show the particular condition of the telltale in all its parts at the time of the happening of the accident.  The presiding justice said:  "The description of the tell-tales—what they were made of—I think was very properly put in, notwithstanding the fact that no particular stress was laid in the declaration upon the fact that there was a knot at the end of it.  They had a right to describe that whole telltale from beginning to end, but when they come to lay stress upon it, and say that is what held it, I think they haven't a right to do it."

This ruling, taken as a whole, was quite as favorable to the defendant as it was entitled to.  Indeed, we fail to see why the plaintiff had not the right to lay stress upon the fact that the ends of the rope were knotted, for the purpose of showing that a loop, when formed of three of such ropes, was much

more dangerous than a loop formed by ropes which were free from knots.

(3)   We deem it proper for us to observe, in regard to the exception now under consideration, that the practice of allowing testimony to be introduced without objection, and then, at some subsequent stage of the trial, moving to strike it out should not be encouraged.   As a rule, the objection should be made when the testimony is offered; and if not then made it should be deemed to be waived.   Otherwise a party could sit by during a protracted trial and allow all sorts of testimony to go in and then call attention to such parts thereof as he saw fit by way of objection, and move to strike it out, thus putting the other party to a disadvantage by putting him off his guard, and causing confusion and delay in the trial of the case.

(4)   The next exception is to the ruling of the court in permitting one of the experts called by the defendant to answer the following question:   "If the tell-tale is so looped or twisted together that a man going along on the top of a car and running into it is caught by the chin and held there, so that he is dragged over the car he is on and the next one, was that tell-tale in proper position when he got to it?"   His answer was:   "I should say not."

The argument against the admission of this testimony is that the accident in question was a very peculiar one, and, so far as known, no such an one had ever happened before; and that the question is not what a man's opinion as to whether a thing is proper or not is, after he has observed the accident in question, but what would be his opinion as to the condition of the thing, concerning which he is testifying, prior to the occurrence of the accident.   In short, the argument is that the defendant would not be chargeable with knowledge of the danger where such knowledge was acquired in consequence of the accident in question.   We agree to the soundness of this part of the argument, but do not think it is pertinent in the case at bar.   For it cannot be said with any show of reason that a tell-tale in the condition that the evidence shows this one to have been was not a dangerous appliance, and it did not require the testimony of an expert to prove this.   And while it is true that

no evidence was offered that such an accident ever happened before, it cannot be said that, in view of the conditions existing, it was not such an one as was liable to happen.   While there was no occasion, therefore, for the production of expert testimony to show that the tell-tale was out of order and dangerous to brakemen while in the discharge of their duties, yet the error in admitting it, if it can properly be said to be error, was clearly harmless to the defendant.   Moreover, it is to be noted that the witness John B. Sheldon, of whom the question now under consideration was asked, was the supervisor of bridges for the defendant corporation, and had charge of the tell-tales on the railroad;   and he had been fully examined by defendant's counsel as an expert regarding the proper construction and inspection of these appliances;   and hence it would seem that the question was pertinent in cross-examination.

The defendant claims that the court erred in excluding testimony that it was customary for the brakemen to straighten out the tell-tales when found to be looped up.

The witness George H. Coffin, called by the defendant, having testified that he was a brakeman at said yard, was asked the question:   "Were orders given to the brakemen as to those tell-tales?"   He answered:   "I had orders ever since I worked on the road."   "Q.   Were orders given to the brakemen, no matter what time, as to those tell-tales?   A.   Yes sir.   Q.   What were those orders?"   This was objected to by Mr. Hogan, on the ground that it was mere hearsay.   The court said:   "If the orders were general, given at the time or about the time that this man went there—if you can trace them home to him—it would be pertinent.   But those orders may have been given some time before and may not have been obeyed or considered by the brakemen, and it may be they were given when it was too late for this man to know anything about it.   If you can show those orders were given about the time the deceased went on the road as a brakeman, it would be proper to show that to affect, if it would, the testimony of the track-walker, who says he did walk the track and did look out for those things.   If he did those things, of course the brakemen could assume that the railroad corpora-

tion was looking out for those things." Mr. Waterman, in behalf of the defendant, said: "The track-walker said it was done between Providence and Worcester, but not in this section." The court: "It is necessary to show that the instructions given were so close to the time of this accident that the men presumably knew what the orders were." Mr. Baker's exception was then noted, but he immediately proceeded to show by the witness, without objection, that the orders referred to were given ever since he had worked on the road and down to the time when McGarrity was hurt. "Q What were those orders? A. If you see any of those tell-tales looped up or anything, straighten them out. Q. How would you straighten them out when you saw them looped up? A. By hand. Q. Where would you be when you did it? A. On top of the car. Q. And could a brakeman in the performance of his duty see when it was looped up readily? A. Yes sir. Q. Was it customary for the brakeman, in consequence of those orders, to straighten out the tell-tales when he saw them looped up?" Mr. Hogan: "I object to the custom there." Mr. Waterman: "I have shown that orders were given." The court: "How is the question material?" Mr. Waterman: "I was stating it was material in connection with what has been shown, that orders were given to do this thing, and I am showing it was customary for brakemen to do those things in consequence of orders, and it would be brought home to Mr. McGarrity by the orders and by brakemen being accustomed to do those things while they were there."

The court ruled that the particular question objected to was not proper.

While we fail to see any very cogent reason for ruling out this particular question, yet the error, if it were such, was clearly harmless, and hence not such an one as to be ground for a new trial.

The defendant had already been allowed to show the orders which were given to the brakemen in the yard concerning the tell-tales, and also to offer testimony that the brakemen had obeyed such orders. In other words, the defendant had been permitted to show, in effect, what the custom of the brake-

men was in the premises; and hence the particular question asked was practically calling for the repetition of a fact already proved.   Moreover, it was competent for the defendant to call all of the brakemen in said yard and prove by them, if it could, that they knew of and obeyed the orders referred to; so that it would seem that there was no occasion for offering proof of any custom, and also that the evidence offered was not the best evidence.

But however this may be, the defendant had all of the advantage from the testimony offered which it could have had if the particular question referred to had been answered, and hence there was no reversible error in ruling it out.

We come now to consider the exceptions taken by defendant's counsel to the rulings of the court in refusing to instruct the jury as requested by its counsel.   The defendant's requests to charge the jury, together with the rulings of the court thereon, were as follows: "1.   The defendant is not required to have the best tell-tales.   If its tell-tales are such as are in common use by ordinarily well managed railroad companies, it has performed its duty in this respect."   This request was granted.

(5)   "2.   The defendant is not bound to have the best inspection of its tell-tales, but only such inspection as ordinary railroad companies give to their tell-tales under like circumstances." This request was refused, and the defendant's exception noted.

"3.   Unless the tell-tale that caused the death of Mr. McGarrity had been looped up for a sufficient time for the defendant to have become aware of it by such inspection as is given to tell-tales by ordinary railroad companies in like circumstances, the verdict must be for the defendant."   This request was granted.

"4.   If Mr. McGarrity knew, or in the exercise of reasonable care might have known, that tell-tales were apt to become looped from time to time, he assumed the risk of injury from such looping, and the verdict must be for the defendant."   This request was refused, and defendant's exception noted.

"5.   If Mr. McGarrity was told to look out for these tell-

tales, and to untie them when he found them looped up, the verdict must be for the defendant." This request was refused, and defendant's exception noted.

"6. If it was customary for the yard brakemen to look out for these tell-tales and to untie them when they were looped up, the verdict must be for the defendant." This request was refused, and defendant's exception noted.

"7. If the yard brakemen were told to look out for these tell-tales and to untie them when they were looped up, their failure to do so is the negligence of a fellow-servant, and the verdict must be for the defendant." This request was refused in these words, and the defendant's exception noted.

"8. If Mr. McGarrity knew, or in the exercise of reasonable care might have known, that this tell-tale had a loop or a half-hitch, the verdict must be for the defendant." This request was refused, and defendant's exception noted.

"9. If the tell-tale became looped up so short a time before the accident that the defendant could not have discovered it by ordinarily careful inspection, the verdict must be for the defendant." This request was granted.

Although the second request to charge was substantially correct as a proposition of law, and might properly enough have been granted, yet as the third request which was granted embodies, to all practical intents and purposes, the same identical principle of law contained in the second, and which fully covered the law applicable to the case upon the point then under consideration, the defendant clearly had all which it was entitled to on this point. There was therefore no occasion for the granting of both requests. Repetition of statement is not only unnecessary, but both court and counsel should always seek to avoid it.

(6) The fourth request was properly refused, for several reasons. First. It was incomplete, inasmuch as it omitted one of the vital and essential elements of assumed risk: *i. e.*, knowledge of the danger reasonably to be anticipated from a known defect. *McGarr* v. *Natl. & Prov. Worsted Mills*, 22 R. I. 347, and cases cited. See also *Pilling* v. *Narr. Machine Co.*, 19 R. I. 666.

Another reason why the request should not have been granted is that it fails to take into account the position and exacting duties devolved upon the deceased at the time of the happening of the accident. He was standing on top of a freight car of unusual height, with his back towards the engine, as his duties then required him to stand, so that he could signal to the switchman at the rear of the train when the proper time came for the engine to be reversed, and the cars could be pushed back upon another track. His duty also required him to signal the engineer when the rear car had passed over the switch, so that he would know when to reverse his engine. The tell-tale, therefore, by which the deceased was caught was behind him; and even if he knew of its condition—of which there is but very slight, if, indeed, it can properly be said that there was any substantial, evidence—it was competent for the jury to find that his duties were so engrossing at the time as to take away all thought of danger, especially from an appliance which was not only not dangerous, if in proper condition, but was known to be a warning against danger.

As pertinently remarked by the court in its charge to the jury, in speaking of the tell-tale: "It was not an appliance to assist him in running the train, but to protect him, as well as others, from coming in contact with that bridge. It was placed there to guard those who were upon the cars." See *Darling* v. *R. R. Co.,* 17 R. I. 708.

Even in those cases where the machine or appliance by which one is injured is inherently dangerous or obviously defective, and known to be so by the servant, he is not necessarily precluded from recovering if it appears that the circumstances connected with the discharge of his duties at the time of receiving the injury would naturally divert his attention for the instant from the danger. See *Disano* v. *Brick Co.,* 20 R. I. 452; *Baumler* v. *Brewing Co.,* 23 R. I. 430, and cases cited; *Mayott* v. *Norcross Bros.,* 24 R. I. 187; Beach on Contrib. Neg., 2nd ed. § 40.

The fifth request to charge was properly refused. It does not follow that, if McGarrity was told to look out for these

tell-tales and to untie them when he found them looped up, that the plaintiff was not entitled to recover. For, as just suggested, notwithstanding such a duty might have been imposed upon him by the defendant, which of course would have given him knowledge of the condition of the tell-tales generally, yet he might not have appreciated the danger arising from the existence of such looping up, and might have been so absorbed in his duties at the time of the accident as not to have had any thought of their condition. Moreover, we fail to find any evidence which shows that the deceased was ever given any such instruction as is contemplated by the fifth request, and hence there was no ground upon which to base it.

(7)    The sixth request was rightly refused. A master cannot escape liability for his failure to perform a duty which the law devolves upon him by reason of the fact that it is the habit or custom of his employees to discharge it for him. Indeed, he cannot avoid liability for the neglect of his servant who is expressly delegated by him to discharge such duty; for the negligence of the servant in this regard is the negligence of the master. *Hanna* v. *Granger*, 18 R. I. 507; *Morgridge* v. *Tel. Co.*, 20 R. I. 386. And this being so, *a fortiori* a master cannot avoid his liability for the failure of his servants generally to observe a mere custom or habit of themselves performing his duty for him, where he has chosen to rely upon such a custom or habit.

The seventh request was rightly refused, for substantially the same reason. The duty to keep the tell-tales in repair was the duty of the defendant as master, and hence the negligence of any servant of the defendant in the premises was its negligence, and not the negligence of a fellow-servant. *Crandall* v. *Stafford Mfg. Co.*, 24 R. I. 555.

The eighth request was properly refused. It is practically a repetition of the fourth request, except that it limits the question of the knowledge of the deceased to the particular loop by which he was injured, while the former referred to his knowledge of the condition of the tell-tales generally. But what we said regarding the fourth request is applicable and controlling here.

Finally, with regard to the requests to charge, we are of the opinion that those which were granted by the court, taken in connection with the charge which had already been given, stated the law applicable to the case with substantial accuracy; and hence that no ground for a new trial is shown in connection therewith.

(8)   We cannot say that the verdict is against the evidence. The testimony for the plaintiff shows that the loop by which the plaintiff's intestate was caught was similar to those which were frequently formed by the exhaust from the engines in passing under the tell-tales. Frank A. Whipple, a freight conductor of long experience, testified that "the exhaust catches the tell-tales and throws them up in the air and sometimes they flop together and form a half loop, and sometimes three or four of them get over and hang there." He had seen the engine loop them up times without number.

Joseph Miller, a brakeman of twelve years' experience, testified to substantially the same state of facts.

Peter Rivard, a brakeman who was present at the time of the accident, and opened the loop after McGarrity had been caught in it, also testified to like effects from the exhaust of the engine. He further testified that such a loop as caused the accident was not made by human hands, and was not a knot formed by tying the ropes together. Roy A. Macomber, another brakeman, who saw this particular loop for a day or two before the accident, testified that it was clearly distinguished from a knot in the tell-tale made by tying the ropes together by hand.

The witness Frank A. Whipple also testified that the loops caused by the exhaust of the engine were clearly different from those tied by brakemen. The following questions and answers illustrate his testimony: " Q.  Have you ever seen a looping up of the tell-tales—a half-hitch made by hand? A. No sir. Q. What kind of a knot was there in those ends where you saw them tied—a half knot or a whole one? A. Well, it was what we would call a running knot, wound right around and thrown over in that manner (indicates), as you wind your handkerchief and draw it into a

sailor knot.  Q.  Is that the same condition of the knot you describe in the case where you say the more pressure you brought to bear the harder they would hug up, where there were bunches on the ends?  A.  No sir; the one is a loop and the other that where somebody tied them.  I make it very distinct, yes sir.  Q.  Then *tied* means something to you?  A. There is a very great difference between a loop and a knot. Q.  What is the difference?  A.  The difference in my estimation is this:  that a knot could not possibly be made in any other way than the hand of man, and a loop can, for I have seen fifteen times that number.  Q.  What do you say of a loop—that it was tied?  A.  No sir."

The brakeman Miller testified that pressure upon any such loop caused it to bind and tighten, and if the ropes had knots or bunches on the ends the loop would hold all the harder.

The plaintiff's evidence shows that the loop by which the plaintiff's intestate was caught had existed in the tell-tale for several days prior to the accident.  Charles F. Perry, who was an eye-witness to the accident, frequently saw such loops before the accident.

The witness Macomber, who was working with one of the crews in said freight yard, saw loops in the tell-tales before the accident, and saw and touched the loop in question a day or two before the accident.  The following questions and answers illustrate his testimony in this regard:  "Q.  Did you notice them on the day of the accident?  A.  Yes sir; I did.  Q.  Did you notice them the day before?  A.  Yes sir; for a week or so before.  Q.  What did you notice for the week just prior to the accident every day?  A.  The way they were looped up.  Q.  Where were they looped up?  A.  Right over tracks No. 5 and 7.  Q.  When you say looped up, what do you mean?  A.  Tangled up and thrown over one another —part of them are knotted on the end.  Q.  How many were looped together in that condition over track No. 5?  A.  I think there were three tied up there and one was looped over —these three made a kind of loop.  Q.  How was your attention called to it?  A.  Well, I was working that forenoon and the back of my head was caught—took the hat off of my

head—and when I came by again I pushed them out of my way.   I saw they were pretty hard there—stuck together.   Q. Did they come apart when you pushed them?   A.  No sir. Q.  These particular loops that you saw that day, had you noticed them before that day?   A.  It was the day before that I noticed them."

Peter J. Hevey, a young man who crossed the Conant street bridge four times daily, testified that he saw the ropes in the tell-tales frequently looped there.

Gerald De Vere, another eye-witness to the accident, who went down by this bridge and through the freight yard daily, testified that he saw this very loop a day or two before the accident, and called the attention of the yard boss to it at that time.   In speaking of the tell-tale where deceased was caught this witness testified, in referring to the ropes, that "they looked as if they had been thrown over that way, a half knot, what I call.   I should say there were three of them, one of them was tangled round two of them that way."   He also testified that one or two days before, he was talking to the boss of the section, and said:  "Jim, I think you will have an accident here yet."   "Q.  What tell-tale did you call his attention to?   A.  These ones that were knotted together.   Q.  What tell-tales, with reference to Mr. McGarrity?   A.  The same ones.   Q.  And what was their condition when you called his attention to it?   A.  The same way.   Q.  How long before the accident?   A.  I should say a day or two before the accident. . . .  Q.  Was there any change made in the tell-tales from the time you called the attention of the yard master to it to the time of the accident?   A.  No sir."

The plaintiff also offered testimony to the effect that the ropes in question showed weather marks after the loop was opened—that they did not hang down as they should, straight and at full length—but were drawn up and twisted in a spiral shape.   This fact tended to show that the ropes had been looped up for some time.  The testimony for the plaintiff also shows, and there is no dispute about this, that the defendant corporation had adopted a system of care and inspection of these tell-tales in order to prevent the very danger which was the

cause of this accident, by providing its track-walkers with a long pole, equipped with an iron hook on the end of it, for the purpose of opening these loops and pulling out these tangles in the tell-tales as they went by them in the discharge of their duties. Several of the witnesses called by defendant corroborated the testimony offered by plaintiff as to the manner in which the loops in the tell-tales were formed, and there is practically no dispute that the loop in question was formed in the way above described.

It therefore clearly appears that the defendant had full knowledge of the general condition of the tell-tales long befor the accident, and recognized its duty in protecting its employees from danger therefrom. And whether it failed in this regard was a question of fact for the jury to decide under the testimony submitted.

Whether the plaintiff was in the exercise of due care at the time of the accident was also a question of fact for the jury to determine under the evidence.

The last ground of the petition for a new trial, viz.: that the damages are excessive, was not relied on at the hearing.

Petition for new trial denied, and case remanded for judgment on the verdict.

*John W. Hogan and Philip S. Knauer*, for plaintiff.
*David S. Baker and Lewis A. Waterman*, for defendant.